UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| LORRI LANGFORD, individually and on behalf of a class of persons similarly situated,<br>　　Plaintiff<br><br>v.<br><br>BUFFALO WILD WINGS INTERNATIONAL, INC., BUFFALO WILD WINGS, INC. and BLAZIN WINGS, INC. d/b/a BUFFALO WILD WINGS, JOHN DOE COMPANIES, 1 through 10, inclusive,<br>　　Defendants | :<br>:<br>:<br>:<br>:   C.A. No. 1: 16-cv-00209-M-LDA<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

## JOINT STIPULATION OF SETTLEMENT AND RELEASE

This Joint Stipulation of Settlement and Release (the "Agreement") is entered into by and between the Plaintiff, Lorri Langford (the "Named Plaintiff"), individually and on behalf of the Opt-in Plaintiffs (as hereinafter defined) (collectively with Named Plaintiff, the "Plaintiffs") and Defendants Buffalo Wild Wings International, Inc., Buffalo Wild Wings, Inc., and Blazin Wings, Inc. d/b/a Buffalo Wild Wings ("Defendants" and together with Plaintiffs, the "Parties").

### RECITALS

**WHEREAS,** on May 10, 2016, the Named Plaintiff filed suit against the Defendants in the United States District Court for the District of Rhode Island, C.A. No.: 1:16-cv-00209-JJM-LDA, captioned *Langford v. Buffalo Wild Wings International, Inc., et al.*, asserting claims under the Fair Labor Standards Act ("FLSA") and the Rhode Island Minimum Wage Act ("RIMWA"), ("the Litigation"); and,

**WHEREAS,** in the Litigation, the Plaintiffs claim the Defendants violated the FLSA and the RIMWA by requiring its servers and bartenders in Rhode Island (collectively "Tipped Workers") to perform improper types, and excessive amounts, of non-tipped work while paying them a reduced minimum wage; and,

**WHEREAS,** the purpose of this Agreement is to settle fully and finally all Released Claims (as hereinafter defined) between the Plaintiffs and the Defendants, including all claims asserted in the Litigation; and,

**WHEREAS,** the Defendants deny all of the allegations made by the Plaintiffs in the Litigation and deny that they are liable or owe damages to anyone with respect to the alleged facts or causes of action asserted in the Litigation. Nonetheless, without admitting or conceding any liability or damages whatsoever, the Defendants have agreed to settle the Litigation on the terms and conditions set forth in this Agreement, to avoid the burden, expense, and uncertainty of continuing the Litigation;

**WHEREAS**, the Litigation was stayed on October 24, 2016 to allow a related collective/class action, which was pending in the United States District Court for the Western District of New York, C.A. No.: 1:15-cv-06340, captioned *Robbins, et al v. Blazin Wings d/b/a Buffalo Wild Wings* (the "*Robbins* Matter"), to proceed and then later determine the effect, if any, the *Robbins* Matter has on the Litigation, including, but not limited to, the participation of putative class members in this Litigation in the settlement of the *Robbins* matter and the existence of arbitration agreements with putative class members;

**WHEREAS**, toward the conclusion and resolution of the *Robbins* Matter, the Parties had an understanding about the potential number of members in the putative class in this Litigation and the amount of the wage claim attributable to each putative class member; and,

**WHEREAS**, Plaintiffs' Counsel analyzed and evaluated the merits of the claims made against the Defendants in the Litigation, discussed the legal issues with the Named Plaintiff, obtained, reviewed and analyzed Defendants' payroll data and time entry data, and based upon their analysis and evaluation of a number of factors, and recognizing the substantial risks of litigation, including the possibility that the Litigation, if not settled now, might not result in any recovery or might result in a recovery less favorable, and that any recovery would not occur for several years, Plaintiffs' Counsel are satisfied that the terms and conditions of this Agreement are fair, reasonable, and adequate and that this Agreement is in the best interests of the Plaintiffs.

**NOW, THEREFORE**, in consideration of the mutual covenants and promises set forth in this Agreement, as well as the good and valuable consideration provided for herein, the Parties hereto agree to a full and complete settlement of the Litigation on the following terms and conditions:

**1.    DEFINITIONS**

The defined terms set forth in this Agreement have the meanings below.

1.1    Acceptance Period. "Acceptance Period" means the one hundred fifty (150) days that a Plaintiff has to sign and cash a Settlement Check, or if a Settlement Check is re-mailed pursuant to the terms of this Agreement, the one hundred fifty (150) day period starting on the date the Settlement Check is re-mailed.

1.2    Agreement. "Agreement" means this Joint Stipulation of Settlement and Release.

1.3    Approval Order. "Approval Order" means the Court's Order Granting Approval of Settlement.

1.4    Court. "Court" means the United States District Court for the District of Rhode Island.

1.5    Days. "Days" means calendar days unless otherwise specified herein.

1.6    Defendants. "Defendants" means Defendants Buffalo Wild Wings International,

Inc., Buffalo Wild Wings, Inc., and Blazin Wings, Inc. d/b/a Buffalo Wild Wings.

**1.7** Defendants' Counsel. "Defendants' Counsel" means Ford Harrison LLP.

**1.8** Effective Date. "Effective Date" means the date on which this Agreement becomes effective and shall be the last of the following dates:

(A) If there is no appeal of the Court's Order Granting Approval of the Settlement, the date 31 days after entry of such Order; or,

(B) If there is an appeal of the Court's Order Granting Approval of the Settlement, the day after all appeals are resolved in favor of approval.

**1.9** Employer Payroll Taxes. "Employer Payroll Taxes" means all taxes and withholdings an employer is requested to make arising out of or based upon the payment of employment compensation in this Litigation, including FICA, FUTA, and SUTA obligations. Employer Payroll Taxes shall not come out of the Gross Settlement Amount.

**1.10** Gross Settlement Amount. "Gross Settlement Amount" means the Seventy-Thousand Dollars ($70,000.00) that the Defendants have agreed to pay to fully resolve and settle this Litigation, including any and all amounts to be paid to the Plaintiffs, and any Court-approved Incentive Award. The Gross Settlement Amount covers and includes all local, state and federal Wage and Hour claims of the Named Plaintiff and Opt-In Plaintiffs, the Incentive Award to the Named Plaintiff, and the fees and expenses of the Settlement Administrator. The Gross Settlement Amount does not include payment of Plaintiffs' Counsel's attorney's fees and costs, which, if approved, will be paid separately by Defendants directly to Plaintiffs' Counsel.

**1.11** Litigation. "Litigation" means the claims pled in the class and collective action Complaint in *Langford v. Buffalo Wild Wings International, Inc., et al.*, C.A. No.: 1:16-cv-00209-M-LDA, alleging violations of the FLSA and the RIMWA.

**1.12** Named Plaintiff. "Named Plaintiff" means Lorri Langford.

**1.13** Net Settlement Fund. "Net Settlement Fund" means the remainder of the Gross Settlement Amount after deductions for: (1) the Settlement Administrator's fees and costs; and, (2) Court-approved Incentive Award to the Named Plaintiff.

**1.14** Notice. "Notice" means Exhibit A, the Court-approved Notice of Settlement of Collective Action Lawsuit.

**1.15** Opt-In Plaintiffs. "Opt-In Plaintiffs" means any and all current and former Tipped Worker, excluding Named Plaintiff, employed by Defendants who receive the Notice and endorse and cash a Settlement Check.

3

1.16 Parties. "Parties" means, collectively, the Named Plaintiff, the Opt-In Plaintiffs, and the Defendants.

1.17 Pay Data. "Pay Data" means Defendants' payroll data and time entry data the for Plaintiffs from September 1, 2013 until June 30, 2018.

1.18 Plaintiffs. "Plaintiffs" shall mean the Named Plaintiff and the potential Opt-In Plaintiffs. There are a total of 245 potential Plaintiffs.

1.19 "Plaintiffs' Counsel" means Formisano & Company, P.C.

1.20 Qualified Settlement Fund or QSF. "Qualified Settlement Fund" or "QSF" means the account established by the Settlement Administrator for the Gross Settlement Amount paid by the Defendants. The QSF will be controlled by the Settlement Administrator subject to the terms of this Agreement and the Court's Approval Order. Interest, if any, earned on the QSF will become part of the Gross Settlement Amount.

1.21 Releasees. "Releasees" means Defendants; Inspire Brands, Inc.; Roark Capital Management, LLC; and each of their respective current and former parent companies, subsidiaries, divisions, and current and former affiliated individuals and entities, legal successors, predecessors (including companies they have acquired, purchased, or absorbed), assigns, joint ventures, and each and all of their respective officers, partners, directors, owners, stockholders, servants, agents, shareholders, members, managers, principals, investment advisors, consultants, employees, representatives, attorneys, accountants, lenders, underwriters, benefits administrators, investors, funds, and insurers, past, present and future, and all persons acting under, by, through, or in concert with any of them.

1.22 Settlement Administrator. The "Settlement Administrator" will be Rust Consulting, Inc., which was mutually selected by Plaintiffs' Counsel and Defendants' counsel.

1.23 Settlement Checks. "Settlement Checks" means checks issued to Plaintiffs for their share of the Net Settlement Fund calculated in accordance with this Agreement.

1.24 Tipped Workers. "Tipped Workers" means employees for whom the Defendants took a tip credit against the minimum wage. Tipped Workers includes, but is not limited to, servers, bartenders and other employees, who worked in Rhode Island and the Defendants paid those employees a sub-minimum tip-credit rate of pay.

## 2. APPROVAL AND NOTICE TO PLAINTIFFS

2.1 Binding Agreement. This Agreement is binding and contains all material agreed-upon terms for the Parties to seek a full and final settlement of the Litigation.

2.2 Retention of the Settlement Administrator. The Settlement Administrator will be responsible for establishing a QSF account; preparing and mailing the Settlement Notices to Plaintiffs; preparing and mailing Settlement Checks; distributing an approved Incentive Award; calculating and paying all appropriate taxes and complying with all applicable tax reporting obligations, including preparing and filing all applicable tax forms; determining Plaintiffs' share of taxes and withholdings for those portions of the individual settlement payments that are treated as wages; calculating Employer Payroll Taxes; retaining and providing a copy to Defendants' Counsel and Plaintiffs' Counsel of Settlement Checks endorsed and cashed by Plaintiffs; reporting to Defendants' Counsel and Plaintiffs' Counsel on a weekly basis the names of all Plaintiffs who have endorsed and cashed Settlement Checks; preparing a declaration describing all duties performed and claims administration statistics; returning any unclaimed QSF amounts to the Defendants following the expiration of the Acceptance Period; and, performing any other duties that are necessary to effectuate the Agreement.

(A) The Parties will have equal access to the Settlement Administrator and all information related to the administration of the settlement. The Settlement Administrator will provide regular reports to the Parties regarding the status of the mailing of the Notices and Settlement Checks and the claims administration process.

(B) The Parties agree to cooperate with the Settlement Administrator in administering the Settlement Notices and Settlement Checks, including with calculating the Plaintiffs' share of the Net Settlement Fund. Defendants agree to provide the Settlement Administrator with accurate information, to the extent reasonably available, which is necessary to calculate each Plaintiff's share of the Net Settlement Fund and locate Plaintiffs. The Parties agree that it is their mutual goal to maximize participation in the settlement.

2.3 **Approval of Motion**

(A) Within fifteen (15) days after the execution of this Agreement, the Named Plaintiff will file a Motion for Order Approving Settlement of Collective Action and Authorizing Notice of Settlement ("Approval Motion"). Plaintiff's Counsel will provide Defendants' Counsel with a draft of the Approval Motion for review and comment as soon as practicable before filing it with the Court and agree to consider any comments Defendants may have in good faith.

(B) With the Approval Motion, Plaintiff's Counsel also will file this Agreement, a proposed Approval Order, and a proposed form of Settlement Notice.

(C) Among other things, the Approval Motion will ask the Court to: (a) issue

and enter the proposed Approval Order approving the Settlement and this Agreement as fair, adequate, and reasonable; (b) approve the Settlement Notice distribution process and proposed Settlement Notice; (c) approve and incorporate the terms of this Agreement; (d) enter a final judgment dismissing the Litigation without prejudice, but keeping the matter open, and converting the dismissal to a final judgment and dismissal with prejudice upon fulfillment of the Settlement's terms; and (e) retain jurisdiction to enforce the Agreement. Defendants will not oppose the Approval Motion.

**2.4    Notice to Plaintiffs**

(A) Within ten (10) days of the Court's issuance of the Approval Order, the Defendants will provide Plaintiffs' Counsel and the Settlement Administrator, in electronic form, the following information for Plaintiffs: name, social security number, last known addresses, last known telephone numbers, last known email addresses, dates of employment, and job titles ("Collective List").

(B) Settlement Notices and Settlement Checks will be mailed simultaneously, via First Class United States mail to the Plaintiffs by the Settlement Administrator no later than twenty-one (21) business days after the Effective Date. Before mailing the Notice to the Plaintiffs, the Settlement Administrator will perform a skip trace on all the Plaintiffs' addresses to obtain the most current address for each Plaintiff.

(C) The Settlement Administrator shall, within five (5) days after the first mailing of the Settlement Notices and Settlement Checks, notify Plaintiffs' Counsel and Defendants' Counsel of the precise date of the end of the Acceptance Period (excluding any extended Acceptance Period for any subsequently re-mailed Settlement Notices and Settlement Checks to any Plaintiff).

(D) Settlement Checks issued pursuant to this Agreement shall expire at the end of the Acceptance Period. If a Plaintiff does not cash his or her Settlement Check by the end of the Acceptance Period, such Settlement Checks will be void. The Plaintiffs will be informed of the Acceptance Period in the Notices and on the Settlement Checks.

(E) The Settlement Administrator shall take all reasonable steps to obtain the correct address for any Plaintiff for whom the Settlement Notice is returned by the United States Postal Service as undeliverable, including using social security numbers to obtain better address information, and attempting to reach Plaintiff by phone and/or e-mail, and shall attempt re-mailings. Any Settlement Notices or Settlement Check returned as undeliverable shall be traced at least one (1) time to obtain a new address

        and be re-mailed by First Class United States Mail. The Settlement Administrator will update Plaintiffs' Counsel and Defendants' Counsel regarding returned mailings for which it is unable to obtain corrected addresses on a weekly basis.

(F)     In the event that the Court fails to approve the Settlement and/or this Agreement, the Parties (a) will attempt to renegotiate the Settlement for the purpose of obtaining Court approval of a renegotiated settlement and agreement, and/or (b) if the Parties agree to do so, seek reconsideration or appellate review of the decision denying approval of the Agreement. In the event reconsideration and/or appellate review is denied, or a mutually agreed-upon settlement modification is not approved, and the Parties decide to forgo further negotiation of a settlement, the Litigation will proceed as if no settlement had been attempted and the Parties retain all rights with respect to their respective claims and defenses. In that event, nothing related to the Settlement or this Agreement, including any and all materials, documents, or information produced, discussed, and/or referred to in preparation for, during, and/or subsequent to the mediation may be used by or against any Party under Rule 408 of the Federal Rules of Evidence.

## 3.    SETTLEMENT TERMS AND ADMINISTRATTION

### 3.1    Settlement Amount

(A)     In consideration for the terms, conditions, and promises in this Agreement, the Defendants agree to pay the Gross Settlement Amount, which shall fully resolve and satisfy any and all amounts to be paid to the Plaintiffs, the Court-approved Incentive Award, and the Settlement Administrator's fees and costs. Aside from Employer Payroll Taxes owed pursuant to the terms of this Agreement and the Court-Approved Attorney's Fees and Costs, the Gross Settlement Amount shall be Defendants' only monetary obligation in connection with the Parties' settlement of the Litigation.

(B)     On or before the date that is ten (10) business days after the Court enters an Approval Order, the Defendants shall deposit the Gross Settlement Amount into the QSF. If the Effective Date does not occur, the Settlement Administrator shall return the Gross Settlement Amount, plus any interest earned on it, to Defendants within seven (7) days of the Defendants providing written notice to the Settlement Administrator and Plaintiffs' Counsel that the Court failed to approve the settlement and there was no appeal (or there was an appeal that was not resolved in favor of approval of the settlement).

(C)     At the expiration of the Acceptance Period, the Settlement Administrator

7

shall advise Plaintiffs' Counsel and Defendants' Counsel of what amount, if any, remains unclaimed by Plaintiffs or that otherwise remains in the QSF. Any portion of the Net Settlement Fund that remains unclaimed by Plaintiffs who do not timely endorse and cash their Settlement Checks by the end of the Acceptance Period, or that otherwise remain in the QSF under the control of the Settlement Administrator upon final accounting of the settlement funds, shall be returned by the Settlement Administrator to the Defendants' counsel.

### 3.2 Settlement Amounts Payable as Attorney's Fees and Costs

(A) In their Approval Motion, Plaintiffs' Counsel shall ask the Court to approve payment of Twenty-Five Thousand and 00/100 Dollars ($25,000.00), as an award of attorney's fees. In addition, Plaintiffs' Counsel shall seek reimbursement of actually incurred, reasonable Litigation-related costs and expenses. The Defendants shall not oppose this application for attorney's fees and costs. These amounts shall constitute full satisfaction of any claim for attorney's fees or costs, and the Plaintiffs agree that they shall not seek, nor be entitled to, any additional attorney's fees or costs under any theory or from any source, incurred in relation to the Litigation other than for any fees and costs incurred related to any efforts to enforce the terms of this Agreement.

(B) The payment of attorney's fees and reasonable costs and expenses are separate and apart from the Gross Settlement Amount and will not reduce the amount of the Gross Settlement Amount.

(C) The substance of Plaintiffs' Counsel's application for attorney's fees and costs is not part of this Agreement and is to be considered separately from, but in conjunction with, the Court's consideration of the fairness, reasonableness, adequacy, and good faith of the Settlement and this Agreement. The outcome of any proceeding related to Plaintiffs Counsel's application for attorney's fees and costs shall not terminate this Agreement or otherwise affect the Court's ruling on the Approval Motion. In the event that the Court (or any appellate court, if Plaintiffs' Counsel appeals the Court's award of attorney's fees and costs) awards less than the requested fees and costs, only the awarded amounts shall be paid and shall constitute full satisfaction of the obligations of this Section and full payment hereunder.

### 3.3 Incentive Award

(A) In her Approval Motion, the Named Plaintiff will apply to the Court to receive an Incentive Award from the Gross Settlement Amount for the services she rendered to the Plaintiffs. Specifically, the Named Plaintiff shall request $5,000.00 as an Incentive Award. The Defendants will not

8

oppose this application.

(B) The Incentive Award and the application for such Incentive Award are separate and apart from, and in addition to, the Named Plaintiff's recovery from the Net Settlement Fund. The substance of the application for Incentive Award is not part of this Agreement and is to be considered separately from, but in conjunction with, the Court's consideration of the fairness, reasonableness, adequacy, and good faith of the Settlement and this Agreement. The outcome of the Court's ruling on the application for Incentive Award shall not terminate this Agreement or otherwise affect the Court's ruling on the Approval Motion. Any Incentive Award money not approved by the Court (or any appellate court, if Plaintiffs appeal the award of Incentive Award) shall become part of the Net Settlement Fund.

### 3.4 Distribution of Payments to Plaintiffs and Plaintiffs' Counsel

(A) The payments to Plaintiffs' Counsel for any Court-approved attorneys' fees and costs will be wired to Plaintiffs' Counsel by the Settlement Administrator within seven (7) days after the Effective Date.

(B) The Settlement Checks will be mailed to the Plaintiffs by the Settlement Administrator along with the Settlement Notices twenty-one (21) business days after the Effective Date, in accordance with Section 2.4.

(C) Incentive Award shall be deducted from the Gross Settlement Amount and paid to the Named Plaintiff from the QSF by the Settlement Administrator within seven (7) days after the Effective Date.

(D) The allocation to the Plaintiffs for their Settlement Checks will be made from the Net Settlement Fund. The proportionate share of the Net Settlement Fund for each Plaintiff will be determined by the Plaintiffs' Counsel pursuant to the following formula:

(1) For each Plaintiff, Plaintiffs' Counsel will calculate each Plaintiff's "individual minimum wages owed" by subtracting (Hours paid a tip-credit wage rate * the sub-minimum tip- credit wage rate the Plaintiff was paid) from (Hours paid a tip-credit wage rate * applicable minimum wage rate) for all Non-Tipped Hours worked between May 10, 2013 and June 30, 2020 according to Defendant's Pay Data ("Owed Minimum Wages").

(2) Non-Tipped Hours Worked for each Plaintiff for every day each Plaintiff worked at Defendants is calculated by subtracting the total tipped hours worked that particular day (time entry of first customer check opened until time entry for last customer check

9

      closed with adjustments for breaks) from the total hours worked that particular day (first clock-in until last clock-out entry) according to Defendants' Pay Data.

   (3) The Plaintiffs' Counsel will designate an amount equal to each Plaintiff's Owed Minimum Wages as "Liquidated Damages".

   (4) Plaintiffs' Counsel will sum all Plaintiffs' Owed Minimum Wages and Liquidated Damages to calculate each Plaintiffs "Individual Amount Owed."

   (5) Plaintiffs' Counsel will sum all Plaintiffs' Individual Amounts Owed to calculate the "Total Owed" to all Plaintiffs.

   (6) Plaintiffs' Counsel will then divide each Plaintiff's Individual Amount Owed by the Total Owed to all Plaintiffs to calculate each Plaintiff's "Portion of the Net Settlement Fund."

   (7) Plaintiffs' Counsel will multiply each Plaintiff's Portion of the Net Settlement Fund by the Net Settlement Fund to calculate each Plaintiffs "Settlement Award."

   (8) If a Plaintiff's Settlement Award is less than $25.00, the Plaintiff's Settlement Award will be increased to the Minimum Settlement Award of $25.00.

 (E) Within five (5) business days of the Court's issuance of the Approval Order, Plaintiffs' Counsel will provide the Settlement Administrator and Defendant's Counsel a spreadsheet with the Settlement Awards for Plaintiffs.

 (F) To the extent permitted by law, in no event shall any Settlement Award or Incentive Award create any credit or otherwise affect the calculation of or eligibility for any compensation, bonus, deferred compensation or benefit under any compensation, deferred compensation, pension or other benefit plan, nor shall any such Settlement Award or Incentive Award be considered as "compensation" under any pension, retirement, profit sharing, incentive or deferred compensation benefit or plan, nor shall any such payment or award require any contribution or award under any such plan, or otherwise modify any benefits, contributions or coverage under any other employment compensation or benefit plan or program.

### 3.5 Tax Characterization

 (A) For tax purposes, fifty percent (50%) of the Settlement Award to each

Plaintiff pursuant to Section 3.4 shall be treated as back wages and fifty percent (50%) of such Settlement Award shall be treated as non-wage relief.

(B) Payments treated as back wages pursuant to Section 3.5(A) shall be made net of all applicable employment taxes ordinarily borne by employees, and for Plaintiffs who negotiate their Settlement Award shall be reported to the Internal Revenue Service ("IRS") and the payee under the payee's name and Social Security Number on an IRS Form W-2. Payments treated as interest and/or liquidated damages pursuant to Section 3.5(A) shall be made without withholding and for the Plaintiffs who negotiate their Settlement Award shall be reported to the IRS and the payee, to the extent required by law, under the payee's name and Social Security Number on an IRS Form 1099. Payments of attorney's fees and costs pursuant to Section 3.2 shall be made without withholding and reported to the IRS and the payee under the payee's name and taxpayer identification number, which each such payee shall provide for this purpose, on an IRS Form 1099. The Settlement Administrator will determine the proper tax treatment of the Incentive Award pursuant to Section 3.3.

(C) Within fourteen (14) days of the Court's issuance of the Approval Order, the Settlement Administrator shall determine the Defendants' share of Employer Payroll Taxes on Settlement Awards to the Plaintiffs and shall communicate such amount to the Defendants with a detailed explanation of the calculations. No later than seven (7) days thereafter, the Defendants will deposit the Employer Payroll Taxes into the QSF. In the event of any dispute as to the calculation of employer's share of payroll taxes, the Parties and the Settlement Administrator shall meet and confer in good faith in an attempt to resolve the dispute. If the dispute cannot be resolved, it shall be submitted to the Court for a final determination. The Settlement Administrator shall thereafter remit and report the applicable portions of the Employer Payroll Taxes to the appropriate taxing authorities on a timely basis pursuant to its duties and undertakings. The Defendants agree to reasonably cooperate with the Settlement Administrator to the extent necessary to determine the amount of the payroll tax payment required under this section.

(D) The employee portion of all applicable income and payroll taxes will be the responsibility of the individual Plaintiff receiving a Settlement Check or Incentive Award. Each individual Plaintiff agrees to indemnify and hold harmless the Defendants for his or her ratable portion of the non-wage relief paid under this Agreement in the event the Defendants incur adverse tax consequences or liability regarding such payment.

4. **RELEASE**

11

**4.1 Release of Claims**

(A) The Plaintiffs who cash Settlement Checks hereby provide the Defendants and the Releasees a full and final release of any claims asserted in the Class and Collective Action Complaint, including any claims for alleged failure to pay the minimum wage under the FLSA and the RIMWA; and any claim for liquidated or multiple damages, penalties, restitution, interest, attorney's fees or costs, declaratory relief, equitable relief, or injunctive relief for any such claims, within the time periods identified in Section 4.1(B) ("Released Claims").

(B) Temporal Scope of Releases. The Plaintiffs shall release any FLSA and RIMWA claims asserted in the Litigation for the time period between September 1, 2013 through June 30, 2020.

(C) This Agreement shall not serve to toll any statute of limitations with respect to the claims against Releasees of any Plaintiff who does not cash a settlement check and provide a full and final release of claims. The dismissal of this action, with or without prejudice, shall have the same effect as if such non-participating Plaintiff did not opt-in to this Litigation and the Parties expressly waive the application of the doctrine of equitable tolling. Nothing in this Agreement will be considered a waiver of any claims by the Plaintiffs that may arise after June 30, 2020.

(D) By signing the Agreement, the Named Plaintiff additionally waives, releases, and discharges the Defendants and the Releasees from any and all claims, counterclaims, demands, causes of action, contracts, agreements, promises, obligations, defenses, or liabilities of any kind or nature whatsoever (collectively, "Claims"), whether known or unknown, whether suspected or unsuspected, whether accrued or contingent, arising before the date the Named Plaintiff signs the Incentive Award check, including, but not limited to, any and all Claims arising directly or indirectly out of her employment or other relationship with the Releasees, her interest or right to compensation from any of the Releasees, or the termination of her employment or other relationship with any of the Releasees. The Claims being released and discharged include, but are not limited to, the following: any and all Claims under Title VII of the Civil Rights Act of 1964, the Civil Rights Acts of 1866, 1871, and 1991, the Age Discrimination in Employment Act (including the Older Workers Benefit Protection Act), the Americans with Disabilities Act, the Equal Pay Act, the Fair Labor Standards Act (including but not limited to claims for overtime pay), the Employee Retirement Income Security Act of 1974, the Family and Medical Leave Act of 1993, the Rhode Island Fair Employment Practices Act, the Rhode Island Civil Rights Act, the Rhode Island Civil Rights of People

12

with Disabilities Act, the Rhode Island Minimum Wage Act, the Rhode Island Wage Payment Act, the Rhode Island Equal Pay Act, the Rhode Island Parental and Family Medical Leave Act, and the Rhode Island Paid Sick and Safe Leave Time Law, as all such laws have been amended from time to time, and any and all other Claims arising under federal, state, or local statute, regulation, order, or common law through the date the Named Plaintiff signs her Incentive Award check. The release shall not apply to: (i) any Claims arising under the terms of this Agreement, (ii) any right they may have to file a charge or complaint with any administrative agency, or (iii) any claim that cannot be released as a matter of law.

4.2  All Settlement Checks sent to Plaintiffs shall contain, on the back of the check, the following limited endorsement:

**SIGNATURE REQUIRED BEFORE DEPOSIT**

**RELEASE OF CLAIMS:**

I understand that I have up to 150 days from the **[DATE OF MAILING]** to sign and cash the enclosed check or it will be void.

By endorsing, depositing, negotiating, or cashing this check, I agree to opt-in to the below identified lawsuit and be bound by the Settlement Agreement negotiated by counsel for the plaintiff in the case *Langford v. Buffalo Wild Wings International, Inc., et al.*, C.A. No.: 1:16-cv-00209-JJM-LDA, in the United States District Court for the District of Rhode Island.

4.3  Non-Admission of Liability. The Defendants make no admission of liability. In the event that the Court shall not ultimately approve the settlement, the parties shall revert to their positions *status quo ante*.

5.  **INTERPRETATION AND ENFORCEMENT**

5.1  Cooperation Between the Parties; Further Acts. The Parties shall reasonably cooperate with each other and shall use their reasonable best efforts to obtain the Court's approval of this Agreement and all of its terms. Each party, upon the request of any other party, agrees to perform such further acts and to execute and deliver such other documents as are reasonably necessary to carry out the provisions of this Agreement.

5.2  No Assignment. Plaintiffs' Counsel and Named Plaintiff, on behalf of the Opt-In Plaintiffs, represent and warrant that they have not assigned or transferred, or purported to assign or transfer, to any person or entity, any claim or any portion

13

thereof or interest therein, including, but not limited to, any interest in the Litigation, or any related action.

5.3  Entire Agreement. This Agreement constitutes the entire agreement between the Parties with regard to the subject matter contained herein, and all prior and contemporaneous negotiations and understandings between the Parties shall be deemed merged into this Agreement.

5.4  Modification. This Agreement may not be changed, altered, or modified, except in a writing signed by the Parties and approved by the Court. Notwithstanding the foregoing, the Parties agree that any dates contained in this Agreement may be modified by agreement of the Parties without Court approval if the Parties agree and cause exists for such modification. This settlement may not be discharged except by performance in accordance with its terms or by a writing signed by the Parties.

5.5  Binding Effect. This Agreement shall be binding upon the Parties and, with respect to the Plaintiffs, their spouses, children, representatives, heirs, administrators, executors, beneficiaries, conservators, attorneys, and assigns.

5.6  Arms' Length Transaction; Materiality of Terms. The Parties have negotiated all the terms and conditions of this Agreement at arms' length. All terms and conditions of this Agreement in the exact form set forth in this Agreement are material to this Agreement and have been relied upon by the Parties in entering into this Agreement, unless otherwise expressly stated.

5.7  Captions. The captions or headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and shall have no effect upon the construction or interpretation of any part of this Agreement.

5.8  Construction. The determination of the terms and conditions of this Agreement has been by mutual agreement of the Parties. Each party participated jointly in the drafting of this Agreement, and therefore the terms and conditions of this Agreement are not intended to be, and shall not be, construed against any party by virtue of draftsmanship.

5.9  Blue Penciling/Severability. If any provision of this Agreement is held by a court of competent jurisdiction to be void, voidable, unlawful or unenforceable, the remaining portions of this Agreement will remain in full force and effect.

5.10 Governing Law. This Agreement shall in all respects be interpreted, enforced, and governed by and under the laws of the State of Rhode Island, without regard to choice of law principles, except to the extent that the law of the United States governs any matter set forth herein, in which case such federal law shall govern.

5.11 Continuing Jurisdiction. The Court shall retain jurisdiction over the interpretation and implementation of this Agreement as well as any and all matters arising out of,

or related to, the interpretation or implementation of this Agreement and of the settlement contemplated thereby.

**5.12** Waivers, etc. to be in Writing. No waiver, modification or amendment of the terms of this Agreement, whether purportedly made before or after the Court's approval of this Agreement, shall be valid or binding unless in writing, signed by or on behalf of all Parties and then only to the extent set forth in such written waiver, modification or amendment, subject to any required Court approval. Any failure by any party to insist upon the strict performance by the other party of any of the provisions of this Agreement shall not be deemed a waiver of future performance of the same provisions or of any of the other provisions of this Agreement, and such party, notwithstanding such failure, shall have the right thereafter to insist upon the specific performance of any and all of the provisions of this Agreement.

**5.13** When Agreement Becomes Binding; Counterparts, This Agreement shall become binding upon its execution. The Parties may execute this Agreement in counterparts, and execution in counterparts shall have the same force and effect as if all Parties had signed the same instrument.

**5.14** Signatures. This Agreement is valid and binding if signed by the Defendants' authorized representative and the Named Plaintiff.

**5.15** Facsimile and Email Signatures. Any party may execute this Agreement by causing its counsel to sign on the designated signature block below and transmitting that signature page via facsimile or email to counsel for the other party. Any signature made and transmitted by facsimile or email for the purpose of executing this Agreement shall be deemed an original signature for purposes of this Agreement and shall be binding upon the party whose counsel transmits the signature page by facsimile or email.

IN WITNESS WHEREOF, the below-signed have executed this Agreement as of the dates set forth below.

BLAZIN WINGS, INC. d/b/a BUFFALO WILD WINGS

By: *Robert Q. Jones, Jr.*
Title: VP, Corporate Counsel
Date: November 13, 2020

BUFFALO WILD WINGS INTERNATIONAL, INC.

By: *Bradley M. Orschel*
Title: Assoc. Gen. Counsel
Date: November 13, 2020

BUFFALO WILD WINGS, INC.

By: *Bradley M. Orschel*
Title: Assoc. Gen. Counsel

LORRI LANGFORD

*Lorri Langford*
Lorri Langford
Date: November 13, 2020

16